# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANTHONY ADKINS, | * |
| *Plaintiff,* | * |
| v. | *    Civil Action No. RDB-23-1768 |
| LUCAS BARNHART and RYAN LaROSE, | * |
| | * |
| *Defendants.* | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **MEMORANDUM OPINION**

In this civil rights action, Plaintiff Anthony Adkins ("Plaintiff" or "Adkins") alleges that on June 29, 2020, while incarcerated at the Maryland Correctional Institution–Hagerstown ("MCI–H"), he was subjected to excessive force at the hands of two correctional officers, Defendants Lucas Barnhart ("Barnhart") and Ryan LaRose ("LaRose") (collectively, "Defendants").[1] *See generally* (ECF No. 4). Adkins claims that he had been arguing with Barnhart while he was showering. He claims that after his shower, when Barnhart had handcuffed him and was walking him back to his cell, Barnhart yanked Adkins to face him, engaged Adkins in a "wing arm" defensive maneuver, and proceeded to drive his face into a steel gate separating the unit's walkway from its dining hall. He also claims that after Barnhart drove his face into the gate, Defendant LaRose, another officer on the unit, came to Barnhart's

---

[1] Adkins was not incarcerated when he filed this action. (ECF No. 4; ECF No. 17 at 13.) However, as he testified in his deposition, he has been incarcerated in relation to a different crime since April 2024. (ECF No. 52-4 at 2.) Maryland's Incarcerated Individual Locator indicates that Adkins is currently incarcerated at the Patuxent Institution in Jessup, Maryland. *See Find an Incarcerated Individual*, Md. Dep't of Pub. Safety & Correctional Servs., https://dpscs.maryland.gov/services/ii-locator.shtml (search by name: Anthony Adkins) (last visited May 4, 2026).

aid. Adkins states that, while escorting him to the prison's medical unit, Defendants threw him into another steel door on a different floor. Adkins alleges injuries, including lacerations to his upper lip and forehead and two broken teeth.

Adkins initiated this lawsuit in the Circuit Court for Washington County, Maryland, which was removed to this Court pursuant to 28 U.S.C. § 1441 and § 1446. (ECF No. 1 ¶ 3.) His Complaint originally consisted of five counts: a 42 U.S.C. § 1983 claim of excessive force in violation of the Eighth and Fourteenth Amendments against Defendants Barnhart and LaRose (Count One); a 42 U.S.C. § 1983 claim of excessive force on a theory of supervisory liability against Denise Gelsinger, the former warden of MCI–H (Count Two); a violation of Articles 16 and 25 of the Maryland Declaration of Rights against Defendants Barnhart and LaRose, as well as against Gelsinger and the Maryland Department of Public Safety and Correctional Services (the "Department") (Count Three); a claim of negligent hiring, training, and supervision against Gelsinger and the Department (Count Four); and a claim of negligence against Gelsinger and the Department.[2] (ECF No. 4.)

Now pending is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 45).[3] This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. The Court has reviewed the parties' submissions, and no hearing is necessary. *See*

---

[2] For the purposes of clarity and as further explained below, the Court notes that Denise Gelsinger and the Maryland Department of Public Safety and Correctional Services are not defendants in this case. (ECF No. 23 at 2.) Adkins originally sued them in addition to Defendants Barnhart and LaRose, but all claims against Gelsinger and the Department were dismissed by this Court in its Memorandum Opinion and Order of September 3, 2024. (*Id.*) As such, this Court uses the term "Defendants" solely to refer to Barnhart and LaRose. Gelsinger and the Department are exclusively mentioned by name.

[3] Although Defendants title their Motion as a Motion to Dismiss, or, In the Alternative, For Summary Judgment (ECF No. 45), the Motion and accompanying memorandum of law (ECF No. 45-1) are written solely as seeking summary judgment. Defendants mention only Federal Rule of Civil Procedure 56. There is no briefing as to dismissal pursuant to Federal Rule of Civil Procedure 12(b). In his Response (ECF No. 52 at 8 n.8), Adkins notes the same. Accordingly, the Court construes Defendants' motion as seeking summary judgment alone.

Loc. R. 105.6 (D. Md. 2025). Put simply, the parties in this case, a state prisoner and two correctional officers, provide the Court with competing accounts of the events of June 29, 2020. These different versions of the same story amount to genuine disputes of material fact which can only be resolved by the factfinder at trial. *See Alexander v. Connor*, 105 F.4th 174, 180 (4th Cir. 2024) (finding the existence of a genuine dispute of material fact precluding summary judgment when prisoner and correctional officers had competing accounts); *Brooks v. Johnson*, 924 F.3d 104, 114 (4th Cir. 2019) (same); *Taylor v. Lang*, 483 F. App'x 855, 857 (4th Cir. 2012) (unpublished) (same). As explained further below, Defendants' Motion for Summary Judgment (ECF No. 45) is DENIED. This case shall proceed to a jury trial.

## BACKGROUND

### I.    Factual History

"[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The Court notes at the outset that much of the relevant factual material in this case comes from Adkins's and Barnhart's respective deposition testimony. (ECF No. 52-3 (Barnhart Dep.); ECF No. 52-4 (Adkins Dep.).) They offer conflicting versions of multiple central facts. Accordingly, before detailing each party's version of the events in question, the Court offers a brief overview of the events in this case for clarity and context.

This case arises out of a physical altercation that took place on June 29, 2020, within the H-1 segregation unit of the Maryland Correctional Institution–Hagerstown between Plaintiff Adkins and Defendants Barnhart and LaRose. (ECF No. 45-1 at 2; ECF No. 52-1 at

4.) On that date, Adkins was housed within the H-1 unit. Defendant Barnhart was assigned as an escort officer on the unit, while Defendant LaRose was assigned as a tier officer. (ECF No. 45-1 at 2; ECF No. 52-1 at 4.) That day was Adkins's shower day. (ECF No. 45-1 at 2.) In the segregation unit, each inmate is personally escorted around the unit by an officer. (ECF No. 52-3 at 5.) Adkins was escorted to the unit's shower area by Defendant Barnhart. (*Id.*) Also with them was Adkins's cell mate, Donald Netz, who was separately escorted by correctional officer Ryan Archambeau.[4] (ECF No. 52-2 at 4–5.)

At some point during Adkins's shower, he began to argue with Barnhart about the length of the shower. (ECF No. 52-3 at 5; ECF No. 52-4 at 7.) The parties agree that Barnhart told Adkins to hurry up. (ECF No. 52-3 at 5; ECF No. 52-4 at 7.) Some minutes later, after Adkins had finished showering, Barnhart opened the shower door, placed Adkins in handcuffs, and proceeded to escort him back towards his cell. (ECF No. 52-3 at 6; ECF No. 52-4 at 7.) It is undisputed that Barnhart began escorting Adkins, who was handcuffed, by using a thumbless C-grip escort, which entailed Barnhart wrapping his own arm around Adkins's upper arm. (ECF No. 52-1 at 5; ECF No. 52-3 at 6.) During that transport, Adkins and Barnhart continued to argue, including Adkins tell Barnhart at one point, "I just do what I'm supposed to do and as far as I'm concerned, you can go f—k yourself." (ECF No. 45-1 at 2; ECF No. 52-4 at 7.) That verbal altercation ultimately escalated into Barnhart attempting to physically restrain Adkins by holding his upper chest, near his neck. (ECF No. 52-3 at 4; ECF No. 52-4 at 7.) As Barnhart restrained Adkins, the two men moved towards the gate separating the walkway from the unit's dining hall. The gate is made of steel bars. Eventually, as a result

---

[4] For the purposes of clarity, Archambeau is not a party to this litigation.

of this physical altercation, Adkins's face struck the steel gate. (ECF No. 52-3 at 8; ECF No. 52-4 at 8.) Adkins was bleeding and cried out about his teeth, two of which had broken and fallen out of his mouth as a result of the impact. (ECF No. 52-3 at 8; ECF No. 52-4 at 8.) At that point, Defendant LaRose—who had been standing nearby waiting to open Adkins's cell—came to assist Barnhart in restraining Adkins. (ECF No. 52-3 at 8; ECF No. 52-4 at 8.)

The two Defendants then escorted Adkins to the prison's medical unit. Medical staff noted that Adkins had a 2.5-centimeter laceration to his forehead that was actively bleeding; a 2-centimeter laceration above his upper lip that cut completely through the flesh of his upper lip to his mouth; a large, open, and bleeding area on the bottom lip; and two broken and partially missing front teeth. (ECF No. 52-2 at 29.) Medical staff ordered that Adkins be transferred to Meritus Medical Center in Hagerstown, Maryland, for further treatment. (*Id.*) He received stitches on his upper lip and forehead. (*Id.* at 4.) Defendants reported the incident to their supervisors after taking Adkins to the prison's medical unit. (ECF No. 45-1 at 4.)

Although the parties agree on this general timeline of events, they offer competing versions of three central events that culminated in Adkins's face hitting the steel gate. First, Adkins claims that he had not long been in the shower when Barnhart came and hit the shower door and told him to hurry up.[5] (ECF No. 52-4 at 7.) He claims that, upon protesting to Barnhart that he and Netz had not been in the shower for much time, Barnhart told them that he was just joking around. (*Id.*) Adkins asserts that he told Barnhart not to joke around with him. (*Id.*) Adkins testified in his deposition that Barnhart then left him and Netz in the shower

---

[5] It is unclear from the record how long this entire incident took place. It is also unclear how long Adkins and Netz were in the shower.

for a short time, and, upon returning, opened the shower door without first cuffing him, then shoved him back into the shower and closed the door. (*Id.*) Adkins testified that Barnhart then came back a third time and handcuffed him to take him back to his cell. (*Id.*)

For his part, Barnhart claims that Adkins's allotted shower time had already run out when he came to the door and told him to hurry. (ECF No. 52-3 at 5.) Barnhart states that Adkins told him not to rush them and threatened him verbally. (*Id.* at 5–6.) Barnhart does not mention Adkins's claim that he shoved Adkins back into the shower. He claims that he was waiting for Adkins to calm down so that he could put him and handcuffs and take him back to his cell. (*Id.* at 6.) Barnhart also claims that Adkins continued to make threats against him while cuffing him and taking him out of the shower. (*Id.*)

Second, the parties disagree about what precipitated the escalation of the physical contact between Adkins and Barnhart during the transport from the showers to Adkins's cell. As noted above, it is undisputed that Adkins was handcuffed for the entirety of the escort. (ECF No. 52-1 at 5; ECF No. 52-3 at 6.) It is also undisputed that Barnhart was physically escorting Adkins using a thumbless C-grip, which involved Barnhart wrapping his own arm around Adkins's upper arm. (ECF No. 52-1 at 5; ECF No. 52-3 at 6.) Finally, the parties do not dispute that at some point during the transport, Adkins suddenly went from facing in the same direction as Barnhart (that is, towards the dining hall gate) to facing him head-on, at which point Barnhart escalated his use of force. (ECF No. 45-1 at 2; ECF No. 52-1 at 5; ECF No. 52-3 at 6.)

Barnhart claims that Adkins changed direction of his own accord. He testified that Adkins suddenly "planted his foot" and "turned into [him]." (ECF No. 52-3 at 6.) Barnhart

claims that, given their ongoing verbal altercation, he did not know if Adkins was going to try to "headbutt [him]" or "check [him] to the ground," and so he responded by placing Adkins in a "wing arm defense" and proceeded to "drive him straight forward." (*Id.*) From Adkins's point of view, he did not turn to face Barnhart. (ECF No. 52-4 at 7.) Instead, Barnhart "yanked [him] sideways to face him." (*Id.*) He testified that Barnhart then put his hand on Adkins's throat and began to choke him. (*Id.*)

Third, the parties offer competing stories about what happened next. It is undisputed that after this escalation, Adkins and Barnhart moved towards the steel gate of the dining hall and that, ultimately, Adkins's face struck the gate and resulted in injuries. (ECF No. 45-1 at 2–3; ECF No. 52-1 at 6.) During his deposition, Adkins testified that Barnhart's increased use of force—again, he specifically claims that Barnhart was choking him—caused him to try to move backwards away from Barnhart. (ECF No. 52-4 at 7–8.) He testified that Barnhart "ran [him] from about six, eight feet away into some steel bars." (*Id.* at 8.) Adkins further testified that Barnhart's grip on him, combined with his being handcuffed, meant that when he tried to turn away from Barnhart his face was "locked right into position to go face first into some steel bars." (*Id.*) Adkins claims that he cried out about his broken teeth and was spitting out blood, and that Barnhart told him to "shut up." (*Id.*) He also asserts that after hitting the steel gate the first time, Barnhart proceeded to slam his face into the bars again. (*Id.*) He claims that Defendant LaRose came over, with each of them taking one of his arms and escorting him down a stairwell. (*Id.*) Adkins testified that Barnhart and LaRose "ran [him] head first into the

steel door downstairs, in the basement," where he then lay in his own blood.[6] (*Id.*) He claims that his next memory is being in the prison's medical unit. (*Id.*)

In Barnhart's telling, after he had assumed a "wing arm defense" with Adkins, he was not able to hold or steer Adkins, and so the only thing he could do was to "drive straight forward." (ECF No. 52-3 at 6.) He testified that he meant to push Adkins, back-first, into the steel grill so that he could regain control of Adkins and put him back into a "hands-on escort." (*Id.*) He then testified that Adkins "was able to spin out" and then "went face first into [the] metal grill." (*Id.*) Barnhart claims that Adkins spun himself around and that that motion caused him to hit the steel gate. (*Id.*) He claims that after Adkins's face hit the steel door, Barnhart put him in an "upper body restraint" and pulled him towards LaRose so that they could regain an escort of him." (*Id.*) Eventually, Barnhart and LaRose put Adkins into a bar-hammer escort and took him to the prison's medical unit. (*Id.* 9–10.)

Later, Barnhart charged Adkins with several rule infractions based on the incident. (ECF No. 45-1 at 4 n.2.) Specifically, he charged Adkins with violating Inmate Rule 312 (interfering with or resisting a search of a person), Inmate Rule 100 (engaging in a disruptive act), and Inmate Rule 410 (demonstrating disrespect, insolence, or use of vulgar language). (ECF No. 45-1 at 4 n.2.) Adkins admitted to violating Inmate Rule 410 and the other two charges were dropped. (ECF No. 4 ¶ 51.)

---

[6] To be clear, Adkins states that he was slammed twice into the steel gate to the unit's dining hall, and rammed head first into a different steel door while being escorted to the medical unit. Barnhart's recitation of the events in this case does not mention the latter two moments. Accordingly, even though the parties dispute *how* Adkins's face came to hit the steel gate the first time, it is undisputed that that event occurred. The existence of the latter two instances is in dispute.

## II.   Procedural History

On May 22, 2023, Adkins initiated this suit by filing a five-count Complaint in the Circuit Court for Washington County, Maryland, against Defendants Barnhart and LaRose as well as the former warden of MCI–H, Denise Gelsinger, and the Maryland Department of Public Safety and Correctional Services. (ECF No. 1 ¶ 3; ECF No. 4.) At that time, Adkins was no longer incarcerated. (ECF No. 4; ECF No. 17 at 13.) In Count One, he alleged a violation of the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, against Defendants Barnhart and LaRose in their individual capacities. (ECF No. 4 ¶¶ 61–65.) Count Two alleged a violation of the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, on a theory of supervisory liability against Denise Gelsinger in her individual capacity. (*Id.* ¶¶ 66–70.) Count Three asserted a violation of Articles 16 and 25 of the Maryland Declaration of Rights against Defendants Barnhart and LaRose, as well as Gelsinger and the Department. (*Id.* ¶¶ 71–84.) Adkins brought Counts Four and Five against both Gelsinger and the Department, alleging negligent hiring, training, and supervision in Count Four (*id.* ¶¶ 85–97) and negligence in Count Five (*id.* ¶¶ 98–102).

Pursuant to 28 U.S.C. § 1441 and § 1446, the Department removed this case to this Court on June 30, 2023. (ECF No. 1.) On October 5, 2023, Barnhart, LaRose, Gelsinger, and the Department jointly moved for dismissal, or, in the alternative, for summary judgment. (ECF No. 14.) The Court treated that Motion strictly as a motion to dismiss. (ECF No. 23 at 2 n.2.) In a Memorandum Opinion entered on September 3, 2024, the Court dismissed all claims as to Gelsinger and the Maryland Department of Public Safety and Correctional Services. (*Id.* at 2.) Specifically, the Court dismissed Counts Two, Four, and Five with

9

prejudice. (*Id.*) The Court also dismissed Count Three with prejudice as to Gelsinger and the Department. (*Id.*) Accordingly, Gelsinger and the Department were dismissed from the case and are no longer parties to this litigation. As to Defendants Barnhart and LaRose, however, the Court denied the Motion to Dismiss and ordered them to file an answer as to Counts One and Three. (ECF No. 23 at 2.)

Barnhart and LaRose filed their Answer to Counts One and Three on September 17, 2024. (ECF No. 26.) This case then proceeded to discovery. *See* (*id.* at 2); *see also* (ECF Nos. 26, 27, 43). On December 2, 2025, the parties indicated that they had concluded discovery. (ECF No. 43.) Defendants filed the pending Motion for Summary Judgment on January 12, 2026. (ECF No. 45.)

## STANDARD OF REVIEW

To win summary judgment under Federal Rule of Civil Procedure 56, Defendants must show that there are no genuine disputes of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A party cannot create a genuine dispute of material fact through "mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 141 (4th Cir. 2008). If the moving party has carried its burden of showing that no material fact exists, then the nonmoving party must produce

10

competent evidence to reveal the existence of a genuine dispute of material fact. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

When considering a motion for summary judgment, a court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Anderson*, 477 U.S. at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). This Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court is not permitted to make credibility determinations at the summary-judgment stage, as such determinations, as well as all genuine factual disputes, belong to the fact finder at trial. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (citing *Anderson*, 477 U.S. at 249). As such, "the plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990)).

## ANALYSIS

As noted above, just two of the original five counts of Adkins's Complaint (ECF No. 4) remain. The first is Count One, which alleges, pursuant to 42 U.S.C. § 1983, that Defendants used excessive force in violation of the Eighth and Fourteenth Amendments to the United States Constitution. (*Id.* ¶¶ 61–65.) The second is Count Three, which alleges that Defendants used excessive force in violation of Articles 16 and 25 of the Maryland Declaration of Rights. (*Id.* ¶¶ 71–84.)

### I.    Excessive Force (Counts One and Three)

This Court has previously noted that the legal analysis of these excessive force claims is identical. (ECF No. 23 at 10–11 (internal citations omitted).) The Supreme Court of Maryland has consistently read Articles 16 and 25 of the Maryland Declaration of Rights as being *in pari materia* with their federal counterparts, specifically the Eighth Amendment. *See Md. Restorative Just. Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *8 (D. Md. Feb. 3, 2017) (quoting *Evans v. Maryland*, 914 A.2d 25, 67 (Md. 2006)); *Smith v. Maryland*, No. RDB-07-1135, 2009 WL 2878538, at *7 (D. Md. Aug. 26, 2009) (citing *Arvanis v. Someset Cnty.*, 664 A.2d 888, 894–95 (Md. 1995)). Accordingly, because the alleged use of excessive force by Defendants Barnhart and LaRose forms the basis of both Count One and Count Three, the Court analyzes those claims together under the federal standard.

The Eighth Amendment to the Constitution's prohibition against cruel and unusual punishments "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996), *overruled on other grounds by*, *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam). An officer violates an inmate's Eighth Amendment rights when he subjects the inmate to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

An inmate's excessive force claim involves both objective and subjective components. *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). "The objective component asks whether the force applied was sufficiently serious to establish a cause of action." *Id.* "This is not a high bar, requiring only something more than '*de minimis*' force." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)); *Wilkins*, 559 U.S. at 339 (explaining that "nontrivial" force is sufficient

to bring an Eighth Amendment excessive force claim); *accord Alexander v. Connor*, 105 F.4th 174, 182 (4th Cir. 2024) (internal citations omitted)).

In this case, there is sufficient evidence to satisfy the objective component.[7] Even considering only those facts which are not in dispute, Barnhart engaged Adkins in a "wing arm defense" and, ultimately, Adkins's face collided with a steel gate. The impact of that collision resulted in a 2.5-centimeter laceration to Adkins's forehead, a 2-centimeter laceration above the upper lip, a "large open area [that wa]s bleeding" on his bottom lip, and two cracked and partially missing front teeth. (ECF No. 52-2 at 26–27, 29.) This is clearly more than "*de minimis*" or "nontrivial" force. *Hudson*, 503 U.S. at 10; *Wilkins*, 559 U.S. at 339. The objective component of Adkins's excessive force claims in Counts One and Three is met.

The subjective component of an excessive force claim asks whether the correctional officers "acted with a sufficiently culpable state of mind." *Williams*, 77 F.3d at 761. This is a demanding standard, *id.*, requiring that a showing that the officers acted with "'wantonness in the infliction of pain.'" *Iko v. Shreve*, 553 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)). Whether such wantonness can be established "ultimately turns on

---

[7] Defendants' briefing collapses these two prongs, discussing concepts focused on the subjective component alongside those that go to the objective component. *See* (ECF No. 45-1 at 8–9). These are separate inquiries, requiring different quanta and types of proof. *See Brown*, 924 F.3d at 112–13. As relevant to the objective component, Defendants argue that a district court must apply five factors to decide whether that component is met. (*Id.*) First, Defendants cite *Whitley v. Albers*, 475 U.S. 312, 321 (1986), as their source for that five-factor analysis. (*Id.*) *Whitley* does not create any factor-based test for the objective component. Rather, in that case, the Supreme Court merely considered three factors that the district court had used and balanced them against two factors that it found "equally relevant." *Id.* at 321. Those five factors were not part of the holding of that case. Second, four of the five factors that Defendants claim make up the analysis of the objective prong are actually the Fourth Circuit's factors for the subjective prong. *See Dean v. Johnson*, 984 F.3d 295, 302 (4th Cir. 2021) (laying our four non-exhaustive factors to determine whether an officer's conduct met the subjective prong by establishing wantonness).

Later in their brief, while discussing the "good faith effort" standard—a concept that relates only to the subjective component of an excessive force claim—Defendants also discuss *de minimis* physical force—a term that sets the minimum bar for the objective component. Those two concepts, good faith effort and *de minimis* force, go to distinct components of the excessive force analysis.

whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). "The question is not whether a reasonable officer *could* have used force to maintain [or restore] discipline, but whether these particular officers *did* use force for that reason." *Brooks*, 924 F.3d at 113 (internal citations omitted) (emphasis in original).

Courts consider four non-exhaustive factors in undertaking this inquiry: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). "As with the underlying facts, 'the proper inferences to be drawn from these factors' are 'matter[s] for the jury.'" *Alexander*, 105 F.4th at 178 (quoting *Brooks*, 924 F.3d at 116)).

Defendants argue that their actions on June 29, 2020, were exclusively taken in a good-faith effort to maintain or restore discipline. (ECF No. 45-1 at 10.) They argue that they acted "in response to Plaintiff's disruptive actions." (*Id.*) In doing so, Defendants reiterate their version of one of the contested facts in this case—that Adkins turned around to face Barnhart of his own accord and was not, as Adkins argues, spun around by Barnhart. (*Id.*) They also argue that Adkins's behavior was "in between active noncompliance and assaultive," and that this behavior caused Barnhart to undertake a "wing arm defensive maneuver." (*Id.*) Even more central to the excessive force claim, Defendants assert that Adkins, due to his own "positioning and continued resistance" caused his own face to strike the steel gate, resulting in his injuries. (*Id.* at 11.)

14

As this Court has already explained, Adkins's version of the events in this case is markedly different. To provide just a few examples of their differing accounts, Adkins states that: Barnhart spun him around without any reason to do so; that Adkins posed no threat to Barnhart or otherwise attempted to be noncompliant; and that it was Barnhart who drove Adkins's face into the steel gate and caused his injuries. (ECF No. 52-4 at 7–9.)

At the summary judgment stage, this Court is "required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). "A court considering a defendant's summary judgment motion may discount a plaintiff's first-hand account '*only* (1) when there is evidence . . . of undisputed authenticity that (2) shows some material element of the plaintiff's account to be *blatantly and demonstrably* false' (3) such 'that no reasonable jury could' credit the plaintiff's version of events. *Alexander*, 105 F.4th at 179 (first quoting *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019) (alterations in original); then quoting *Scott*, 550 U.S. at 380).

Considering the record in its entirety—which consists in large part of Adkins's and Barnhart's conflicting statements—there are genuine issues of material fact with respect to the subjective prong of the excessive force analysis. *Alexander*, 105 F.4th at 182 ("[T]he court must decide a summary judgment motion on the assumption that the factfinder would believe [the non-moving party's] evidence and credit it over any contrary evidence offered by the moving party."); *Brooks*, 924 F.3d at 112.

15

A jury crediting Adkins's telling of the events of June 29, 2020, could find that he never posed a "reasonably perceived threat" to the officers, even when arguing with Barnhart and telling him that he could "go f—k himself." A jury could find that Barnhart caused Adkins's face to hit the steel gate. Accordingly, for these reasons, the Court concludes that there are genuine issues of material fact with respect to the subject component of the excessive force analysis. Defendants' Motion for Summary Judgment (ECF No. 45) is DENIED.

## II.    Qualified Immunity

Separate from their arguments as to the merits of the excessive force claims in Counts One and Three, Defendants argue that they are entitled to summary judgment on the basis of qualified immunity. (ECF No. 45-1 at 12.) Law enforcement officers sued in their individual capacities under § 1983 may invoke the doctrine of qualified immunity, which shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity analysis has two prongs: first, whether a statutory or constitutional violation occurred; second, whether the right was clearly established at the time of the violation. *Cooper v. Doyle*, 163 F.3d 64, 79 (4th Cir. 2025) (citing *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021)). The plaintiff bears the burden on the first prong, and the officers bear the burden on the second prong.[8] *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) (citing *Henry v. Purnell*, 501 F.3d 374, 377–78 & n.4 (4th Cir. 2007)). At the summary judgment stage, the court's task is to "consider whether there

---

[8] Defendants incorrectly assert that Adkins bears the burden on both prongs. The United States Court of Appeals for the Fourth Circuit employ a "split burden of proof" on the two prongs of qualified immunity. *Stanton*, 25 F.4th at 233.

are any material disputes of fact . . . that, when resolved, would amount to the violation of a clearly established constitutional right."[9] *Id.* at 234. "If there are, summary judgment is inappropriate." *Id.* As this Court has already noted, there are multiple genuine disputes of material fact in this case.

As noted above, Defendants bear the burden of proof on the second prong: whether the right in question was clearly established at the time of the putative violation. *Stanton*, 25 F.4th at 233. It is well-established that there is a constitutional right of a prisoner to be protected from excessive force. In *Hudson v. McMillian*, 503 U.S. 1, 4 (1992), the Supreme Court found that correctional officers had used excessive force in violation of the Eighth Amendment when they physically assaulted an inmate solely as a result of an argument. *Hudson*, 503 U.S. at 4.

If the jury were to credit Adkins's version of the events of June 29, 2020, that would clearly violate clearly established law with respect to use of force by correctional officers. Accordingly, there are genuine issues of material fact and Defendants are not entitled to summary judgment on qualified immunity at this stage.

### III.    Sovereign Immunity Under the Maryland Tort Claims Act (Count Three)

Defendants also argue that they are entitled to immunity from suit as to Count Three, Adkins's Maryland Declaration of Rights claim, under the Maryland Tort Claims Act, Md. Code Ann., State Gov't §§ 12-101 *et seq.* "The [Maryland Tort Claims Act] provides a limited

---

[9] Neither party briefs the relevant standard for analyzing qualified immunity at the summary judgment stage. Instead, the parties jump to assessing the merits of the two prongs of the analysis, focusing especially on whether any clearly established right existed on June 29, 2020. (ECF No. 45-1 at 12–14; ECF No. 52-1 at 18–19.) The Fourth Circuit's precedent on analyzing qualified immunity at this stage precludes the Court from proceeding to those questions without first considering the effect of any genuine disputes of material fact. *Stanton*, 25 F.4th at 237.

waiver of sovereign immunity and is the sole means by which the State of Maryland and its personnel may be sued in tort." *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 637 (D. Md. 2010) (internal quotations omitted). Under § 12-105 of the Act, state personnel sued for conduct undertaken in the performance of their public duties are entitled to immunity unless they acted with "malice or gross negligence." Md. Code Ann., State Gov't § 12-105 (incorporating by reference Md. Code Ann., Cts. & Jud. Proc. §5-522(b)). For these purposes, malice means "actual malice," or "conduct 'characterized by evil or wrongful motive, intent to injury, knowing and deliberate wrongdoing, ill-will, or fraud." *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004) (internal citations and quotations omitted). Gross negligence is "something *more* than simple negligence, and likely more akin to reckless conduct." *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 862 A.2d 1026, 1035 (Md. 2004) (emphasis in original).

Defendants' argument that they are entitled to immunity on Count Three relies, in large part, on the same arguments raised regarding qualified immunity. (ECF No. 45-1 at 17.) For the same reasons stated above, the existence of genuine issues of material fact precludes the Court from finding that Defendants are entitled to qualified immunity on Count Three.

## CONCLUSION

For the reasons stated above, the Motion for Summary Judgment of Defendants Barnhart and LaRose (ECF No. 45) is DENIED. This case shall proceed to a jury trial.

A separate Order follows.

Date: May 5, 2026

_/s/_____
Richard D. Bennett
United States Senior District Judge

18